ORIGINAL

1  Robert J. Nelson (State Bar No. 132797)
   rnelson@lchb.com
2  Lexi J. Hazam (State Bar No. 224457)
   lhazam@lchb.com
3  LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP
4  275 Battery Street, 29th Floor
   San Francisco, CA 94111-3339
5  Telephone: 415.956.1000
   Facsimile: 415.956.1008
6
   Attorneys for Relators
7

FILED
CLERK, U.S. DISTRICT COURT

AUG 19 2015

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

PAID

AUG 19 2015

Clerk, US District Court
COURT 4612

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  United States of America ex rel.          Filed Under Seal Pursuant to
    Amit Patel and Anthony Huh,               31 U.S.C. § 3730(b)(2)
12                                            Case No.
                  Plaintiffs,                 CV15 - 06325-ODW(PJWx)
13
    v.
14                                            COMPLAINT FOR DAMAGES,
    International Career Development           WITH DEMAND FOR JURY TRIAL
15  Center, Inc., ZipEdTech, LLC, and
    Anna Berkovitz Berger,                     Causes of Action:
16
                  Defendants.                  1. Knowingly False Statements to Get a
17                                             False or Fraudulent Claim Paid or
                                               Approved, in Violation of the False
18                                             Claims Act, 31 U.S.C. § 3729(a)(1)(A).

19                                             2. Knowingly False Records or
                                               Statements to Get a False or Fraudulent
20                                             Claim Paid or Approved, in Violation of
                                               the False Claims Act, 31 U.S.C.
21                                             § 3729(a)(1)(B)

22                                             3. Knowingly False Statements Material
                                               to an Obligation to Pay or Transmit
23                                             Money or Property, in Violation of the
                                               False Claims Act, 31 U.S.C. §
24                                             3729(a)(1)(G)

25                                             4. Knowing Concealment or Knowing
                                               and Improper Avoidance of an
26                                             Obligation to Pay or Transmit Money or
                                               Property, in Violation of the False
27                                             Claims Act, 31 U.S.C. § 3729(a)(1)(G)

28

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

Plaintiffs and Relators Amit Patel and Anthony Huh allege as follows:

## I.   **INTRODUCTION**

1.     This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims presented by Defendants International Career Development Center, Inc. ("ICDC"), ZipEdTech, LLC and Anna Berkovitz Berger to the United States Department of Education for payment pursuant to Title IV of the Higher Education Act ("HEA").

2.     Defendants made false statements and submitted false and fraudulent certifications of compliance with material conditions of payment under the federal student loan program. Defendants further avoided an obligation to return monies to the federal government.

## II.   **JURISDICTION AND VENUE**

3.     This action is brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, et seq., and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

4.     This Court has in personam jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process.

5.     31 U.S.C. § 3732(a) provides: "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

6.     Venue is proper in the Central District of California because Defendants maintain and operate their headquarters and all physical campuses within this District, and acts alleged herein occurred in this District.

7.     Relators have direct and independent knowledge of the information upon which these allegations are based and voluntarily provided the information underlying their allegations to the United States before filing these claims. Further,

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

1  the allegations and transactions upon which this action is based were not previously

2  publicly disclosed.

### III.  Plaintiffs

4      8.    Until June of 2015, Plaintiff-Relator Amit Patel was employed as Vice

5  President of Information Technology and Business Intelligence at Defendant

6  ZipEdTech, LLC ("ZipEdTech"), a California limited liability corporation spun off

7  by ICDC in 2013.

8      9.    In this position, he was responsible for developing and deploying

9  computer systems that manage ICDC's financial and operational activities. He held

10  his most recent position or a similar position, first at ICDC and then at ZipEdTech,

11  for most of the past five years. In June 2015, he sought and found other

12  employment, resigning from ZipEdTech on amicable terms.

13      10.    Relator Anthony Huh is employed at ICDC as Director of Continuing

14  Education. In this job, he has worked with faculty members on a broad variety of

15  ICDC academic programs. Previously, he was employed as ICDC's Online Campus

16  Director.

### IV.  Defendants

18  **A.**    **Identity of Defendants**

19      11.    Defendant ICDC is a private, for-profit institution of higher education

20  with four locations in the greater Los Angeles area: a 27,600 square foot main

21  campus located in Huntington Park, a 5,000 square foot satellite classroom facility

22  located in Huntington Park, a 24,000 square foot principal corporate office and

23  distance education administrative office located in Culver City, and a corporate

24  headquarters administrative office in Los Angeles.

25      12.    ICDC offers approximately 19 educational programs of study, which

26  enroll many students of limited means who rely on federal financial aid programs.

27      13.    ICDC offers educational programs both in-person and online, through

28  courses completed by computer in its distance education program.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

14.     ICDC is incorporated under the laws of California, with its principal place of operations in Los Angeles, California.

15.     A true and correct copy of ICDC's current online course catalog can be accessed online.[1]

16.     ICDC is a proprietary institution of higher education within the meaning of 20 U.S.C. § 1002(b).

17.     Defendant ZipEdTech is an education business management company that is paid by ICDC to provide business services to ICDC. Consisting of ICDC's former information technology, marketing, operations and product development departments, ZipEdTech was spun off from ICDC in 2013.

18.     Defendant Anna Berkovitz Berger is President and CEO of ICDC. Berger is the majority shareholder of ZipEdTech. Her brother, Oleg Shvarts, a urologist, is CEO of ZipEdTech and holds a minority of its shares.

**B.     Alter Ego Liability**

19.     ICDC and ZipEdTech both function under the sole control of Berger, who has absolute authority to make decisions on behalf of either or both corporate entities, including the decision to move funds from one entity to another or from one or both of the entities to her own personal accounts.

20.     ICDC and ZipEdTech operate out of the same corporate office, located at 11859 Wilshire Blvd., Suite 600, Los Angeles, California, 90025. Approximately half of the personnel at that office are employed by ICDC and half by ZipEdTech. Whether they are officially employed by ICDC or ZipEdTech, employees work interchangeably for both corporations.

21.     Berger formed ZipEdTech by transferring four departments, including all personnel, from ICDC to the newly created ZipEdTech LLC, and exercised her

---

[1] The current "distance education" course catalog can be viewed online at http://www.icdccollege.edu/wp-content/uploads/2014/08/ICDC-COLLEGE-ONLINE-CATALOG.pdf.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR JURY TRIAL

1    sole authority to name her brother, a urologist with no significant education

2    business experience, CEO of the company.

3        22.   ICDC pays ZipEdTech to provide services to ICDC that ICDC

4    formerly provided for itself. Title IV funds disbursed to ICDC as described herein

5    are in turn paid to ZipEdTech.

6        23.   Upon information and belief, Berger directs that funds be transferred

7    to her personal accounts from ICDC and/or ZipEdTech accounts on a quarterly

8    basis. The amount of these transfers is determined at Berger's sole discretion.

9        24.   Upon information and belief, Berger commingles funds and freely

10   moves them between the entities, as well as between one or more entities and

11   herself, in furtherance of the fraudulent schemes described herein. By creating

12   artificial legal distinctions among Berger, ICDC and ZipEdTech, Defendants are

13   able to perpetrate the fraud.

14   **V.    Specific False Claims and Fraudulent Statements**

15   **A.    Legal Background for the Fraudulent Conduct**

16       25.   The United States Department of Education (the "DOE") disburses

17   about $140 billion in student aid annually and manages an outstanding loan

18   portfolio of $1 trillion.[2]

19       26.   The disbursement of federal student aid dollars is governed by Title IV

20   of the HEA, which establishes several student grant and loan programs, including

21   the Federal Pell Grant Program ("Pell"), the Federal Supplemental Educational

22   Opportunity Grant Program ("FSEOG"), the Federal Perkins Loan Program

23   ("Perkins") and the Federal Direct Loan Program.[3]

24

25     [2] U.S. Department of Education Office of Inspector General, Semiannual Report to

26   Congress (No. 69, Apr. 1, 2014-Sept. 30, 2014) at 11, available at

27   http://www2.ed.gov/about/offices/list/oig/semiann/sar69.pdf.

  [3] In 2010, the Federal Family Education Loan (FFEL) Program was discontinued

28   and replaced by the Direct Loan program.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

27.    Students do not receive these funds directly. Rather, the DOE transmits the federal funds to qualifying academic institutions who participate in DOE Federal Student Aid ("FSA") programs. The academic institutions then credit the federal funds against students' balances.

28.    In order to participate in a Title IV program and receive FSA funds, an educational institution must meet certain standards set forth in federal regulations. *See* 34 C.F.R. §§ 668.11-668.28.

29.    ICDC applied for recognition by DOE as an "institution of higher education" or an eligible institution for purposes of a specific loan or grant program. 20 U.S.C. §1094(a); 20 U.S.C. §1001(a) & (b); 20 U.S.C. §1002(a) & (b); 34 C.F.R. § 668.13(a).

30.    The DOE recognizes ICDC as an eligible institution for purposes of Title IV.

31.    ICDC sought eligibility as a "proprietary institution of higher education," which means, among other relevant considerations, that it is a for-profit business, that it is required to provide training that prepares students for gainful employment in a recognized occupation, and that it must be accredited by a nationally recognized accrediting agency or other specified association. 20 U.S.C. § 1002(b); 34 C.F.R. § 600.5.

32.    The DOE recognizes ICDC as a proprietary institution of higher education.

33.    In order to receive federal student loan funds, ICDC was required to enter into a written Program Participation Agreement (PPA) with the Secretary of Education. 34 C.F.R. § 668.14.

34.    By entering into the PPA, ICDC certified that it would "comply with all statutory provisions of or applicable to Title IV of the HEA" and "all applicable regulatory provisions prescribed under that statutory authority, … including the

COMPLAINT FOR DAMAGES, WITH DEMAND FOR JURY TRIAL

1  requirement that the institution will use funds it receives . . . solely for the purposes

2  specified in and in accordance with that program." 34 C.F.R. § 668.14(1).

3      35.    On the first page, in bold text surrounded by a box, a typical PPA

4  states, "The execution of this Agreement by the Institution and the Secretary is a

5  prerequisite to the Institution's initial or continued participation in any Title IV,

6  HEA Program."

7      36.    Upon information and belief, as President and CEO of ICDC, Anna

8  Berger signed the PPA on behalf of ICDC.

9      37.    Upon information and belief, in signing the PPA, Anna Berger

10  acknowledged the following:

11              I understand that if my institution provides false or

12              misleading information, the U.S. Department of

13              Education may deny the institution's request for

14              eligibility to participate in federal student financial aid

15              programs and/or revoke eligibility once it has been

16              granted and (b) the institution may be liable for all

17              federal student financial aid funds it or its students

18              received. I also understand that I may be subject to a fine

19              of not more than $25,000 or imprisonment of not more

20              than five years, or both, for misinformation that is

21              material to receipt and stewardship of federal student

22              financial aid funds.

23      38.    Since the time ICDC first entered into the PPA in the late 1990s, ICDC

24  has been recertified to participate as an eligible institution for purposes of Title IV.

25      39.    However, in the fiscal year that ended December 31, 2012, ICDC

26  violated a DOE rule requiring that every proprietary institution of higher education

27  derive at least 10% of its revenue from non-Title IV funding sources, or otherwise

28  be subjected to certain enumerated sanctions. *See* 34 C.F.R. § 668.14(b)(16).

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

1   40.   Because ICDC failed to comply with that rule, the DOE placed ICDC
2   on provisional certification status and subjected it to heightened cash monitoring
3   requirements (known by DOE as "HCM1") for two years. According to the DOE,
4   ICDC was no longer on the provisional certification list as of March 1, 2015.[4]

5   **B.   Legally Required Compliance with Accreditation Standards**

6   41.   To qualify as an "institution of higher education," an institution must
7   be accredited by a nationally recognized accrediting agency or association
8   recognized by the Department. 20 U.S.C. §1001(a)(5) and 20 U.S.C. §1002(b).

9   42.   Thus an institution's eligibility for participation in federal student aid
10  programs explicitly depends on its accreditation by a nationally recognized
11  accrediting agency. 34 C.F.R. § 600.4(a)(5).

12  43.   Furthermore, when it signed the PPA, ICDC agreed that it "will meet
13  the requirements established pursuant to part H of Title IV of the HEA by the
14  Secretary and nationally recognized accrediting agencies." 34 C.F.R. §
15  668.14(b)(23). These "program integrity" requirements ensure, among other things,
16  that institutions of higher education demonstrate administrative and fiscal
17  responsibility on an ongoing basis. *See* 20 U.S.C. § 1099b (accreditation
18  requirements).

19  44.   ICDC represents both to the public and to the U.S. Department of
20  Education that it is accredited by the Accrediting Commission of Career Schools
21  and Colleges (ACCSC).

22  45.   ICDC received its initial accreditation from ACCSC on August 1,
23  1999. In June 2014, ICDC's main campus and distance education program were
24  reaccredited by ACCSC for a period of five years. Its previous reaccreditation
25  occurred in 2009.

26

27

---

28  [4] *See* https://studentaid.ed.gov/sa/about/data-center/school/hcm.

- 8 -   COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

46. ACCSC maintains regularly updated "Standards of Accreditation" that schools it accredits must meet in order to be accredited by ACCSC. A true and correct copy of the Standards of Accreditation can be accessed online.[5]

47. Under ACCSC Rules of Process and Procedure, ICDC is obliged to comply on a continuous basis with the Standards of Accreditation. By applying for and receiving ACCSC accreditation, ICDC explicitly accepted the obligation to demonstrate continuous compliance with these standards, including a requirement that each accredited school maintain a specified graduation rate for each program that the school offers.

48. In seeking accreditation and reaccreditation, ICDC is required to and does submit documentation of its compliance with ACCSC accreditation standards, including its compliance with the graduation rate requirement.

49. ICDC is required to and does submit an Annual Report to ACCSC documenting its compliance with ACCSC accreditation standards, including its compliance with the graduation rate requirement.

50. Under federal law, falsification of any document used for or pertaining to an institution's accreditation constitutes fraud involving the administration of a Title IV, HEA program. 34 C.F.R. § 668.83(c)(2)(iii)(C)(2).

C. **Defendants' False Certifications Concerning ICDC's Compliance with Accreditation Standards**

51. ICDC has routinely falsified documents pertaining to its accreditation.

52. On many occasions, ICDC has manipulated data to make it appear as if ICDC programs maintain a graduation rate that, in fact, they do not maintain.

53. In annual reports and reaccreditation filings, ICDC has submitted false graduation rate statistics to ACCSC, making the records appear as if more students graduated from its programs of study than in fact did graduate.

---

[5] *See* http://www.accsc.org/Accreditation/Standards-of-Accreditation.aspx.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR JURY TRIAL

54.   Internal business records demonstrate the falsity of the graduation rates submitted to ACCSC by ICDC.

55.   By way of example, ICDC internal records demonstrate that the actual completion rate for the ICDC Alcohol and Drug Counseling Diploma Program in the 2013-2014 academic year was 32%.

56.   However, ICDC reported to ACCSC that the Alcohol and Drug Counseling Diploma Program's completion rate that year was 60%.

57.   Similarly, ICDC internal records demonstrate that the actual completion rate for the ICDC Alcohol and Drug Counseling Associate's Degree Program in the 2013-2014 academic year was 6%.

58.   However, ICDC reported to ACCSC that the Alcohol and Drug Counseling Associate's Degree Program completion rate that year was 42%.

59.   Similarly, ICDC internal records demonstrate that the actual completion rate for the ICDC Homeland Security Associate's Degree Program in the 2013-2014 academic year was 11%.

60.   However, ICDC reported to ACCSC that the Homeland Security Associate's Degree Program's completion rate was 48%.

61.   ICDC falsifies graduation rates for many of its distance education programs.

62.   For example, in January 2012, ICDC Executive Director Revekka Geykher told Relator Huh that she needed to make a distance education program's graduation rate appear to be several percentage points higher than it in fact was.

63.   In an effort to increase this graduation rate for submission to ACCSC, Geykher directed that records be falsified to reflect that one student, whose initials are G.B., was enrolled in the distance education program. In fact, this student had graduated from a program at the Los Angeles campus in 2010 and was no longer enrolled at ICDC, nor had the student ever been enrolled in the distance education program.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR JURY TRIAL

64.    This falsified data was then submitted to ACCSC, making it appear as if ICDC met ACCSC's graduation rate standards, when, in fact, ICDC did not meet those standards.

65.    ICDC retained its ACCSC accreditation and has not faced any adverse action from ACCSC due to ICDC's self-reported false graduation rates.

66.    Graduation rate falsification is pervasive at ICDC. In June 2010, Relator Patel was asked by ICDC Executive Director Geykher and Regional Campus Director Yana Treystman to convert a graduation rate report that is system-generated from the database into an Excel spreadsheet format. They then directed him to develop Excel formulas that would enable them to modify ICDC program graduation rates by arbitrarily and falsely switching students' status from "terminated" to "graduated." They had Relator Patel develop the spreadsheet so ICDC officials could manipulate individual student records and see graduation rates automatically adjust, allowing ICDC officials to reach the desired graduation rate.

67.    Relator Patel witnessed them switching students' status in this manner, falsely modifying program graduation rates.

68.    Soon thereafter, Geykher and Treystman sent Relator Patel the spreadsheet so that he could make adjustments to the formulas. It was evident that dozens of students' program graduation and job placement statuses had been falsified.

69.    Upon information and belief, these particular fraudulent graduation statistics were submitted to the California Bureau of Private Postsecondary Education (BPPE), the state agency tasked with regulating private for-profit colleges.

70.    ICDC officials have similarly manipulated data using the same spreadsheet "template" created by Patel every year since 2010.

71.    ICDC's official student records, which it maintains and uses internally, nonetheless reflect accurate graduation rates.

- 11 -

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

72.     Using similar methods, ICDC generates and submits falsified data to ACCSC.

73.     The practice of manipulating graduation rates before they are submitted to ACCSC is widespread at ICDC. Relators are personally aware of it happening for at least 5 years.

74.     If ACCSC were aware that ICDC was deliberately submitting falsified graduation rates to ACCSC, then ICDC may lose its accreditation.

75.     If DOE were aware that ICDC was deliberately submitting false documents pertaining to its accreditation, DOE would not make payments of federal student loan funds to ICDC, because ICDC's actions constitute fraud involving the administration of a Title IV program. *See* 34 C.F.R. § 668.83(c)(2)(iii)(C)(2).

### D.     Defendants' False Certifications Concerning Students' Satisfactory Academic Progress

76.     In signing a PPA, ICDC agreed to "establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds." 20 U.S.C. § 1094(a)(3); 34 C.F.R. § 668.14(b)(4).

77.     Records that ICDC "must" maintain include those "document[ing]" each student's eligibility to receive federal funds and of any refunds due on behalf of the student.  34 C.F.R. § 668.24(c)(1)(iii)-(iv).

78.     To remain eligible to receive federal student loan funds, each student is required to maintain Satisfactory Academic Progress ("SAP") in his or her course of study. 34 C.F.R. § 668.32(f).

79.     Additionally, DOE explicitly requires every educational institution that receives Title IV funds to develop reasonable standards for measuring SAP in order to determine whether a student is eligible to receive federal funds. 34 C.F.R. § 668.16(e).

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

80.   Federal regulations define reasonable standards for measuring SAP. Among other requirements, each institution's SAP policy must ensure that students complete academic programs within the "maximum timeframe," which is defined as 150% of the published length of the program for programs measured in credit hours, and stay on a minimum pace of completion. 34 C.F.R. § 668.34(a) & (b).

81.   Students who fail to keep up with the minimum pace of completion eventually lose eligibility to receive Title IV funding. *Id.* § 668.34(a)(7), (a)(8) & (c).

82.   Falsifying any document pertaining to a student's eligibility constitutes fraud involving the administration of a Title IV, HEA program. 34 C.F.R. § 668.83(c)(2)(iii)(A).

83.   As a condition of its receipt of federal student aid funds, ICDC is required to comply with the foregoing regulations.

84.   ICDC, however, routinely falsifies student eligibility data to make it appear as if students are maintaining SAP when, in fact, they are not.

85.   Relators have knowledge of at least two methods ICDC officials use to fraudulently maintain the eligibility of students who are not maintaining SAP:

a.   ICDC officials routinely and fraudulently place poor-performing students on an "approved leave of absence," allowing them to make up missing academic work while not adversely impacting their SAP.

b.   ICDC officials routinely terminate students from enrollment, and then allow them to make up missing academic work after termination and while not enrolled as students at ICDC.

86.   Under both methods, ICDC fraudulently ensures that students maintain their eligibility to receive federal funding by permitting them to perform academic work "off the clock" in violation of the 150% "maximum timeframe" SAP requirement.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

87.     Anna Berger has repeatedly authorized the fraudulent use of leaves of absence and termination to enable students to continue taking courses in violation of SAP regulations, and to enable ICDC to continue receiving federal funds for those students.

88.     In regular meetings with the ICDC Director of Financial Aid, Director of Student Services and Director of the Online Campus, Anna Berger reviews a "pushed funds report." This report reveals the amount of federal student aid dollars that cannot be released to ICDC due to students not meeting SAP and other requirements.

89.     In a meeting attended by Relator Patel, Anna Berger asked what needed to be done to get students qualified so ICDC could access the "pushed" Title IV funding. She authorized the fraudulent use of leave and termination to render students eligible.

### 1.     Approved Leaves of Absence

90.     By entering into a program participation agreement with the DOE, ICDC explicitly certified that it would "comply with the requirements of § 668.22." *See* 34 C.F.R. § 668.14(b)(24).

91.     That regulation governs an educational institution's obligations to return federal funds to the DOE when a student withdraws from the institution during a payment period or period of enrollment in which the student began attendance. 34 C.F.R. § 668.22.

92.     A student is considered to have withdrawn from a payment period or period of enrollment when that student does not complete all the days in the payment period or period of enrollment that the student was scheduled to complete. 34 C.F.R. § 668.22(a)(2).

93.     One exception to withdrawal is an "approved leave of absence." 34 C.F.R. § 668.22(d). To be considered an "approved leave of absence," a leave of absence must have been requested by the student and approved by the institution in

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

1  accordance with the institution's formal policy regarding leaves of absence; the

2  institution must determine that there is a reasonable expectation that the student will

3  return to school; and the student must not exceed 180 days of approved leave in any

4  twelve-month period, among other conditions. *Id.*

5      94.    The "reasonable expectation of return" condition is intended "to

6  prevent an institution from granting a student a leave of absence merely to delay the

7  return of unearned Title IV, HEA program funds." Student Assistance General

8  Provisions, Federal Family Education Loan Program, 64 FR 43024-01.

9      95.    ICDC has a policy by which students can request an approved leave of

10  absence. *See infra* n. 1, ICDC Course Catalog at 16.

11      96.    In violation of this policy and § 668.22(d), ICDC personnel have

12  falsified records to make it appear as if a student requested and received an

13  approved leave of absence, when in fact, ICDC affirmatively contacted students and

14  instructed them to request a leave of absence or face termination, and the leave of

15  absence was often approved without any reasonable expectation that the student

16  would return to school.

17      97.    Under these circumstances, a student must be considered as having

18  withdrawn under applicable regulations, and ICDC is required to make a return

19  calculation to determine the amount of Title IV funds it must return to the federal

20  government. 34 C.F.R. § 668.22(a)(2) & (b).

21      98.    ICDC officials, acting at the direction of Anna Berger, ICDC Regional

22  Director of Student Services Stephanie Perez and Online Campus Director of

23  Student Records Rimma Podasheva, unilaterally decide to place students who have

24  fallen behind in their coursework on a leave of absence. Then, ICDC advisors

25  contact students and advise them to back-date leave of absence request forms to the

26  date that they first began to fall behind. Importantly, these students who have fallen

27  behind do not initiate the leave of absence; rather, ICDC contacts them

28  prospectively to urge them to take a leave of absence based solely on the fact that

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

1  they have fallen behind on their coursework, thereby putting ICDC's Title IV

2  funding in jeopardy.

3      99.   In these calls—which, like all admissions, student services and

4  financial aid calls at ICDC are recorded—ICDC academic advisors coach students

5  to cite legitimate reasons when completing the leave of absence request form in

6  order to give it an appearance of credibility.

7      100.   Even if the leaves of absence were to constitute "approved leaves of

8  absence," ICDC uses them impermissibly to skirt DOE regulations. Federal

9  regulatory guidance makes clear that a student "has not ceased to perform

10  academically if the student is completing the course work through independent

11  study rather than by taking classes at the institution" and thus any leave of absence

12  under such circumstances "would not be considered a leave of absence for Title IV,

13  HEA program purposes." Student Assistance General Provisions, FFEL and Direct

14  Loan Program, 64 FR 59016, 59027.

15      101.   ICDC officials permit students to complete coursework in an

16  independent study while on these fraudulent leaves of absence, effectively stopping

17  the clock on the "maximum timeframe" and "minimum pace" requirements. Then,

18  on the date the student returns from the leave of absence, grades are entered based

19  upon the coursework the student completed while on leave.

20      102.   The students ICDC urges to take leaves of absence are on or nearing

21  "financial aid warning," a federally defined status assigned to a student who fails to

22  make SAP. Students on financial aid warning lose their eligibility to receive Title

23  IV funds if they fail to make SAP for two consecutive payment periods. 34 C.F.R. §

24  668.22(b) & (c).

25      103.   ICDC's students' leave of absence records and transcripts demonstrate

26  that ICDC evades the 150% "maximum timeframe" and "minimum pace"

27  requirements by allowing students to use leaves of absence to complete

28  coursework. ICDC places students in what is called a "study hall" or "academic

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

assistance" program and assigns them an ICDC "mentor," who works with them to complete the coursework while the maximum timeframe clock is stopped due to the leave of absence. This practice violates ICDC's own SAP policy, which requires that the time taken to repeat or make up failed coursework must fall within the maximum timeframe for a course. *See* ICDC Distance Education Online Catalog at 18-19; *see also* Student Assistance General Provisions, Federal Family Education Loan Program, the William D. Ford Federal Direct Loan (Direct Loan) Program, 64 FR 59016-01 (noting that "when a student returns from a leave of absence, the student should be continuing the academic program where it left off").

104.   ICDC's online software access logs reveal that students complete coursework while on leave.

105.   For example, ICDC records indicate that A.E., a student who was first enrolled in an ICDC Homeland Security Associate's Degree distance education program, which has a maximum timeframe of 136.5 weeks, on July 30, 2012, was placed on financial aid warning status multiple times in 2013. On November 27, 2013, A.E. was placed on financial aid warning (effective date: November 11, 2013) set to expire on November 29, 2013.

106.   On December 6, 2013, records show that A.E. was placed on a leave of absence that was back-dated to begin November 22, 2013. It expired March 14, 2014, the same date A.E. was again taken off "financial aid warning" status.

107.   Meanwhile, ICDC online software access logs recorded 747 "actions" by A.E. in the online learning management system between November 29, 2013 and March 12, 2014, including logging in, viewing course material and submitting assignments.

108.   On March 14, 2014—the same date A.E. returned from a leave of absence and was taken off financial aid warning—seven grades (all "Cs") were posted on A.E.'s official transcript.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

109.   By fraudulently putting A.E. on leave of absence status and instructing A.E. to continue completing assignments in an independent study, ICDC was able to ensure that A.E. did not violate federal Satisfactory Academic Progress or maximum timeframe requirements, violations which would have jeopardized ICDC's ability to collect Title IV funds for A.E.

110.   ICDC's fraudulent use of leave of absence allowed it to maintain A.E.'s eligibility for Title IV funding and thus allowed it to keep all federal funds received for her prior to her leave of absence, rather than having to reimburse those funds to the government as would otherwise have been required. ICDC's fraudulent use of leave of absence also allowed it to continue to receive additional funds for A.E., who maintained SAP by virtue of the work she performed while on leave of absence and therefore could continue her enrollment at ICDC instead of withdrawing, thus reaping ICDC additional federal funds.

111.   Similarly, distance education student M.W. enrolled in the Homeland Security Diploma Program, which has a maximum timeframe of 54 weeks, on April 15, 2013 (with an expected completion date of December 20, 2013). M.W. took a leave of absence which was initiated by ICDC on February 4, 2014 (effective date: January 30, 2014), returning April 24, 2014 (effective date: April 21, 2014).

112.   Between February 3, 2014 and April 20, 2014—roughly the dates M.W. was on leave—ICDC online software access logs recorded 184 "actions" by M.W. in the online learning management system.

113.   Four letter grades, all "Cs," were posted to M.W.'s official transcript on April 21 and 23, 2014, just as M.W. returned from leave.

114.   M.W. graduated from ICDC on April 23, 2014, just as M.W. returned from leave, according to an enrollment record entry made by ICDC personnel on May 1, 2014.

115.   By fraudulently putting M.W. on approved leave of absence status and instructing M.W. to continue completing assignments, ICDC was able to ensure

COMPLAINT FOR DAMAGES, WITH DEMAND FOR JURY TRIAL

1   that M.W. did not violate federal Satisfactory Academic Progress or maximum

2   timeframe requirements, jeopardizing ICDC's ability to collect Title IV funds for

3   M.W.

4        116.   Relators have documented numerous similar instances of fraudulent

5   conduct relating to many ICDC students.

6        117.   In early 2015, ICDC Vice President of Compliance Rene Nunez

7   learned that ICDC was having students do coursework after putting them on a leave

8   of absence. Recognizing that this practice violates federal law, Nunez instructed

9   that all leave of absence requests by distance education students must henceforth be

10   reviewed by his department.

11        118.   After Nunez intervened, the approval rate for leaves of absence

12   dropped sharply, prompting ICDC to lose Title IV funding for students who failed

13   to make Satisfactory Academic Progress. In response, Anna Berger recently

14   ordered the Compliance department to grant every leave of absence request.

15           **2.**   **Terminated and Re-Enrolled Students**

16        119.   ICDC has also routinely and fraudulently administratively terminated

17   students who were behind on their coursework and urged them to catch up on

18   coursework while unenrolled, thereby sidestepping the "maximum timeframe" and

19   "minimum pace" requirements. On or about the date these students re-enrolled in

20   ICDC programs, grades were fraudulently posted for work they performed while

21   terminated.

22        120.   This practice began after ICDC realized that many students who were

23   terminated would not be able to graduate within the maximum timeframe if

24   readmitted, thus rendering them—and ICDC—ineligible for Title IV funds.

25   Terminations and re-enrollments were often employed when ICDC officials could

26   not use the leave of absence method to secure continued funding because students

27   were too far behind on SAP to catch up by taking the remaining leave days

28   available to them.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

121.   To evade this requirement, ICDC implemented its fraudulent termination and re-enrollment policy. Specifically, Revekka Geykher instructed Relator Huh to allow students to work while terminated so they would be eligible for re-enrollment.

122.   Student termination records and transcripts demonstrate that ICDC fraudulently evaded the federal maximum timeframe and pacing requirements by allowing students to continue to work in the program despite not being officially enrolled.

123.   For example, distance education student T.W. enrolled in the Forensic Scientist Associate's Degree Program on October 24, 2011. After being placed on financial aid warning, financial aid suspension and then probation, T.W. was terminated from the program on December 28, 2012 (effective date: December 21, 2012) for academic reasons. The termination was voided on January 16, 2013 and immediately reinstated that same day.

124.   Six months later, on June 17, 2013, T.W. re-enrolled in the Forensic Scientist Associate's Degree Program. That same day, grades for six ICDC courses were posted to T.W.'s official transcript, notwithstanding the fact that T.W. was not enrolled for the previous six months. T.W. received a "C" in all the ICDC courses.

125.   By fraudulently terminating T.W. while allowing T.W. to complete coursework, ICDC circumvented federal Satisfactory Academic Progress and maximum timeframe regulations and ensured its continued access to Title IV funds for T.W. in violation of its signed PPA and federal law.

126.   Distance education student J.H. enrolled in the Forensic Scientist Associate's Degree Program on April 16, 2012. After being placed on financial aid warning on December 21, 2012, J.H. was terminated from the program for academic reasons on May 3, 2013.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

127.   On July 8, 2013, J.H. re-enrolled in the program. That same day, grades for seven ICDC courses (all "Cs") were posted to J.H.'s official transcript, notwithstanding the fact that J.H. was not enrolled for the prior two months.

128.   On July 15, 2013, one week later, grades for three more ICDC courses (all "Cs") were posted to the transcript. That same day, J.H. graduated from the program.

129.   By fraudulently terminating J.H. while allowing J.H. to complete coursework, ICDC circumvented federal Satisfactory Academic Progress and maximum timeframe regulations and ensured its continued access to Title IV funds for J.H. in violation of its signed PPA and federal law.

130.   Relators have documented numerous similar instances of fraudulent conduct.

**E.     Defendants' Submission of Claims for Payment by the Federal Government**

131.   ICDC regularly submits student enrollment status data to DOE using the National Student Loan Data System (NSLDS) and student loan data to DOE using EdExpress, software that manages Title IV student loans.

132.   When submitting this data to DOE, ICDC employees who have been authorized to use these programs certify students' enrollment status on behalf of ICDC.

133.   DOE payments are conditioned upon compliance with accreditation requirements, Satisfactory Academic Progress requirements and maximum timeframe requirements.

134.   Each of the certifications described herein is material to the DOE's decision to provide Title IV funds to ICDC.  DOE would not disburse federal funds to ICDC if DOE knew ICDC was deliberately submitting false information to its accrediting agency, or that ICDC was deliberately accepting funds for students considered ineligible under federal law.

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

1    135.   According to publicly available data, ICDC has received at least $174
2    million in Title IV funding since 2010.

3    136.   In 2010-11, ICDC received $47 million in Title IV funding: $12
4    million in subsidized Direct Loan payments, $16.6 million in unsubsidized Direct
5    Loan payments and $18.5 million in Pell Grant payments.

6    137.   In 2011-12, ICDC received $53 million in Title IV funding: $13.6
7    million in subsidized Direct Loan payments, $19.3 million in unsubsidized Direct
8    Loan payments and $20 million in Pell Grant payments.

9    138.   In 2012-13, ICDC received $45 million in Title IV funding: $11.5
10   million in subsidized Direct Loan payments, $16.7 million in unsubsidized Direct
11   Loan payments and $17 million in Pell Grant payments.

12   139.   In 2013-14, ICDC received $29 million in Title IV funding: $7.2
13   million in subsidized Direct Loan payments, $10.4 million in unsubsidized Direct
14   Loan payments and $11.4 million in Pell Grant payments.

15   140.   Internal ICDC records, meanwhile, demonstrate that ICDC has
16   received $284,121,765 in net federal funding since 2008, $273,013,060 of which
17   was provided under the federal Direct Loan, Stafford Loan, Pell Grant and
18   Supplemental Educational Opportunity Grant programs.

19                          **First Cause of Action**

20   **Knowingly False Statements to Get a False or Fraudulent Claim Paid or**
21   **Approved, in Violation of the False Claims Act, 31 U.SC. § 3729(a)(1)(A)**

22   141.   Relators re-allege, and fully incorporate herein by reference, all
23   preceding paragraphs.

24   142.   In performing all of the acts set out herein, Defendants defrauded the
25   United States of America by knowingly presenting, or causing to be presented, to
26   one or more officers, employees or agents of the United States of America, a false
27   and fraudulent claim for payment or approval, in contravention of the False Claims

28

- 22 -                    COMPLAINT FOR DAMAGES, WITH DEMAND FOR
                          JURY TRIAL

1  Act (31 U.S.C. § 3729(a)(3)), to the damage of the treasury of the United States of

2  America, by causing the United States to pay out money it was not obligated to pay.

3      143.   Relators estimate that, as a proximate result of Defendants' conduct

4  described herein, the amount of damages sustained by the United States of America

5  is in excess of $174 million since 2010.

6                          **Second Cause of Action**

7  **Knowingly False Records or Statements to Get a False or Fraudulent Claim
   Paid or Approved, in Violation of the False Claims Act, 31 U.S.C.**

8                          **§3729(a)(1)(B)**

9      144.   Relators re-allege, and fully incorporate herein by reference, all

10  preceding paragraphs.

11      145.   By virtue of the acts described above, Defendants have knowingly

12  made, used or caused to be made or used, a false record or statement to get a false

13  or fraudulent claim paid or approved by the United States of America, in

14  contravention of the False Claims Act (31 U.S.C. § 3729(a)(2)), to the damage of

15  the Treasury of the United States of America, by causing it to pay out money it was

16  not obligated to pay.

17      146.   Relators estimate that, as a proximate result of Defendants' conduct

18  described herein, the amount of damages sustained by the United States of America

19  is in excess of $174 million since 2010.

20                          **Third Cause of Action**

21  **Knowing use of a false statement material to an obligation to pay or transmit
   money or property to the Government, in Violation of the False Claims Act,**

22                          **31 U.S.C. § 3729(a)(1)(G)**

23      147.   Relators re-allege, and fully incorporate herein by reference, all

24  preceding paragraphs.

25      148.   By virtue of the acts described above, Defendants have knowingly

26  made, used, and/or caused to be made or used, false records or statements material

27  to an obligation to pay or transmit money or property to the Government, in

28

                          - 23 -        COMPLAINT FOR DAMAGES, WITH DEMAND FOR
                                        JURY TRIAL

contravention of 31 U.S.C. § 3729(a)(1)(G), to the damage of the Treasury of the United States of America.

149.   Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of $174 million since 2010.

## Fourth Cause of Action

**Knowing concealment or knowing and improper avoidance of an obligation to pay or transmit money or property to the Government, in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**

150.   Relators re-allege, and fully incorporate herein by reference, all preceding paragraphs.

151.   By virtue of the acts described above, Defendants have knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government pursuant to 31 U.S.C. § 3729(a)(1)(G), to the damage of the Treasury of the United States of America.

152.   Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of $174 million since 2010.

## Prayer for Relief

WHEREFORE, Plaintiffs request the following relief:

153.   Judgment in favor of the United States of America against Defendants, jointly and severally, by reason of the violations of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Dollars ($5,000.00) and not more than Ten Thousand Dollars ($10,000.00) for each violation;

154.   Award to the Relators, as the Qui Tam plaintiffs, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act on the United States' recovery;

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

155.   Award to the Relators of all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act; and

156.   Such other and further relief as the Court deems proper.


Dated:      August 19, 2015        Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By: _____
     Robert J. Nelson
     Lexi J. Hazam
     Attorneys for Relator

Robert J. Nelson (State Bar No. 132797)
rnelson@lchb.com
Lexi J. Hazam (State Bar No. 224457)
lhazam@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

John T. Spragens (to be admitted *pro hac vice*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
One Nashville Place
150 4th Ave. N., Suite 1650
Telephone:  615.313.9000
Facsimile:  615.313.9965

COMPLAINT FOR DAMAGES, WITH DEMAND FOR
JURY TRIAL

ORIGINAL

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| United States of America ex rel. Amit Patel and Anthony Huh | International Career Development Center, Inc., ZipEdTech, LLC, and Anna Berkovitz Berger |

| (b) County of Residence of First Listed Plaintiff<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   Los Angeles<br>*(IN U.S. PLAINTIFF CASES ONLY)* |
|---|---|

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.<br><br>Lexi Hazam, Lieff Cabraser Heimann & Bernstein, 275 Battery Street, 29th floor, San Francisco, CA 94111, (415) 956-1000 | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- ☐ 1. U.S. Government Plaintiff
- ☒ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

- ☒ 1. Original Proceeding
- ☐ 2. Removed from State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Reinstated or Reopened
- ☐ 5. Transferred from Another District (Specify)
- ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ TBD at Trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Federal False Claims Act, 31 U.S.C. section 3729, et seq.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☒ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

CV 15 - 06325

| FOR OFFICE USE ONLY: | Case Number: |
|---|---|

CV-71 (10/14)   CIVIL COVER SHEET   Page 1 of 3

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.? *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes ☒ No | | ☐ NO. Continue to Question B.2. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes ☒ No | | ☐ NO. Continue to Question C.2. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| **D.1. Is there at least one answer in Column A?** | **D.2. Is there at least one answer in Column B?** |
|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. | If "yes," your case will initially be assigned to the EASTERN DIVISION. |
| Enter "Southern" in response to Question E, below, and continue from there. | Enter "Eastern" in response to Question E, below. |
| If "no," go to question D2 to the right. ➡ | If "no," your case will be assigned to the WESTERN DIVISION. |
| | Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: | WESTERN |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☒ No |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court?**    ☒ NO    ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court?**

☒ NO    ☐ YES

If yes, list case number(s): _____

**Civil cases** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):**    _Leah Hazam_    DATE: 8/19/2015

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |